AO 91 (Rev. 11/11)  Criminal Complaint

**LODGED**
CLERK, U.S. DISTRICT COURT
6/22/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____KM_____ DEPTUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
6/23/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____clee_____ DEPUTY

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Farhan Khan, | ) | Case No.   2:26-mj-03679-DUTY |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____October 1, 2025_____ in the county of _____Los Angeles_____ in the _____Central_____ District of _____California_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(a)(1) | (Dealing in Firearms Without a License) |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

Ani Ghaltakhchyan, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   June 23, 2026

_____
*Judge's signature*

City and state:     Los Angeles, California

The Honorable Steve Kim, U.S. Magistrate J
*Printed name and title*

*AUSA:*  Eric L. Mackie x3289

**AFFIDAVIT**

I, Ani Ghaltakhchyan, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.   I am a Special Agent ("SA") with the ATF and have been so employed since June of 2021.  I am currently assigned to the Glendale Field Office of the Los Angeles Field Division of ATF, which conducts investigations into violations of federal firearms, explosives, and narcotics laws.  My experience as an ATF SA includes, but is not limited to, conducting physical surveillance, executing search and arrest warrants, and participating in controlled drug/gun purchases using informants. I have experience investigating violations of federal statutes governing firearms and narcotics.  I have also conducted surveillance of persons trafficking firearms and illegal controlled substances, and persons possessing illegal firearms.

2.   As part of my training, I attended the Criminal Investigator and Special Agent Basic Training Academies for ATF at the Federal Law Enforcement Training Center in Glynco, Georgia for approximately 27 weeks.  This training included instruction on federal and state firearms and narcotics laws and regulations.  I graduated Magna Cum Laude with a Bachelor's degree in Criminal Justice and Law in Society from California State University, Los Angeles. Additionally, I received a Master of Science in Criminology with a concentration in Global Criminology from San Jose State University.

## II. **PURPOSE OF AFFIDAVIT**

3.    This affidavit is made in support of a criminal complaint against and arrest warrant for Farhan Khan ("KHAN") for a violation of 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms Without a License).

4.    This affidavit is also made in support of a search warrant for:

a.    the outbuilding that sits at the southernmost portion of the parcel of land located at 3540 W Imperial Hwy, Inglewood, CA 90303 and described further in Attachment A-1 (the "SUBJECT PREMISES");

b.    a black BMW SUV bearing California License Plate 9SPW452 (the "SUBJECT VEHICLE"), as described further in Attachment A-2; and

c.    the person of KHAN as described further in Attachment A-3.

5.    The requested search warrant seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(a)(1) (Dealing in Firearms Without a License); 18 U.S.C. § 933(a)(1) (Firearms Trafficking); 26 U.S.C. § 5861(d) (Unlawful Possession of Certain Firearms); 18 U.S.C. § 371 (Conspiracy to Deal in Firearms Without a License)(the "Subject Offenses") as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

2

information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III.  <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Controlled Buys with Steven Zepeda**

7.    On or about September 29, 2025, a detective from the Los Angeles Police Department ("LAPD") contacted me and told me that an LAPD investigation developed evidence showing that a man named Steven Zepeda ("Zepeda") was selling guns illegally.[1] Additionally, the detective provided me with two phones numbers used by ZEPEDA to conduct illegal gun sales.

8.    After receiving that information, I tasked an ATF CI (the "CI") with contacting Zepeda to buy guns.  On or about September 30, 2025, the CI sent a text message to one of the numbers provided to me by the LAPD detective and Zepeda responded.  Later, in a series of text messages and phone conversations using coded language, Zepeda agreed to sell the CI a gun on October 1, 2025.

---

[1] After learning ZEPEDA's identity, I caused an ATF Industry Operations Investigator to run ZEPEDA's name through the ATF's Federal Licensing System ("FLS"), which contains information on all federal firearms licenses issued by the federal government. Following that review, the investigator determined that ZEPEDA does not have a federal firearms license to sell guns in the United States.

9.    On October 1, 2025, that agreed-upon transaction was completed when Zepeda sold the CI a gun during a controlled transaction at a house in Inglewood.  Then, the CI completed four more controlled drug buys with Zepeda on October 6, 2025, October 9, 2025, October 23, 2025, and November 13, 2025.

**B.    Controlled Buy with Zepeda's Associate, Laura Ortiz**

10.    On or about December 1, 2025, the CI received a call from telephone number 951-593-8112 (the "8112 Number") that s/he answered.  The caller identified herself as an associate of Zepeda (the "Caller"), and said (in substance and summary) that Zepeda was incarcerated and needed money for bail, so Zepeda tasked the Caller with contacting the CI to gauge the CI's interest in buying items that belonged to Zepeda.  The CI expressed interest, so the Caller and the CI ended their conversation with promises to be in contact in the future.

11.    After the CI reported his/her conversation with the Caller to me, I instructed the CI to maintain contact with the Caller and the CI complied.  Then, in a series of telephone calls and text messages using coded language that took place between December 1, 2025, and December 3, 2025, the Caller agreed to sell the CI a gun, ammunition, and a quarter pound of methamphetamine at a home in Lennox (the "Lennox Home") on December 3, 2025.

12.    In advance of the agreed-upon deal at SUBJECT PREMISES 1 on December 3, 2025, the CI met with law enforcement and was outfitted with a body-worn recording device.  Based on my review of the recording captured by that device, my conversations with

4

other law enforcement agents/officers, and my own personal knowledge, I know that:

     a.   the CI drove his/her car to the Lennox Home, parked on the street in front of the residence, placed a call to the 8112 Number and the Caller answered;

     b.   a short time after that call ended, a woman later identified as Laura Ortiz ("Ortiz") exited the Inglewood Home, entered the CI's car, and sold the CI what appeared to be a quarter pound of methamphetamine in exchange for $500.[2]

13.   Later, I retrieved the suspected methamphetamine that Ortiz sold the CI and sent it to the Drug Enforcement Administration Southwest Laboratory (the "Southwest Lab") for testing, which confirmed that the suspected methamphetamine was, in fact, 110.4 grams of actual methamphetamine.

**C.   Controlled Drug and Gun Buy From Ortiz at Location Controlled by ATF**

14.   Following that controlled transaction at Inglewood Home, I instructed the CI to maintain contact with Ortiz and the CI complied.  As a result of those continued communications, Ortiz sold the CI drugs again on December 15, 2025, at a specified location that is controlled and used by ATF for controlled transactions like the ones described herein.  Based on my review of recordings captured that day, my conversations with other law enforcement agents/officers, and my own personal

_____

[2] I queried law enforcement databases and discovered that the 8112 Number is associated with Ortiz.  Then, I obtained a California Department of Motor Vehicles photograph of Ortiz that I showed to the CI, who identified Ortiz as the person who sold him/her drugs in front of the Inglewood Hime on December 3, 2025.

5

knowledge, I know that Ortiz sold the CI and UC-1 111.8 grams of actual methamphetamine (as confirmed by Southwest Lab testing) in exchange for $400.

**D.    Controlled Gun Buy With Ortiz and KHAN Leads to Identification of the SUBJECT PREMISES**

15.    Following that controlled transaction at the ATF Undercover Location, I instructed the CI to maintain contact with Ortiz and the CI complied.  In a series of telephone calls and text messages using coded language that took place between December 17, 2025, and December 28, 2025, ORTIZ agreed to sell the CI more guns and drugs on December 29, 2025.  Then, on the afternoon of December 29, 2025, Ortiz sent a text message to the CI where she asked to change the agreed-upon location of the deal when she said "[c]an u meet me somewhere else I cant make it over their [sic] im getting a ride to the homies house were im gonna get everything from[.]"  When the CI replied and asked where that friend's house was located, Ortiz sent a text that said "Imperial and Yukon" which is the nearest intersection to the SUBJECT PREMISES.  Then, Ortiz sent a text message that contained a digital link to the address 3544 W. Imperial Highway in Inglewood, which is a restaurant located next to the SUBJECT PREMIESES.  Following those exchanges, Ortiz and the CI agreed to meet in the parking lot of an AutoZone located at 2876 West Imperial Highway (the "AutoZone") to complete the agreed-upon deal.[3]

---

[3] The AutoZone is just over a half mile away from the SUBJECT PREMISES, and the drive between the two location takes approximately two minutes.

16. In advance of the agreed-upon deal at the AutoZone on December 29, 2025, the CI met with law enforcement and was outfitted with a body-worn recording device. Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

a. Ortiz arrived at the AutoZone in a black BMW SUV bearing California License Plate 9SPW452 (the "SUBJECT VEHICLE"), which was being operated by KHAN;

b. after KHAN parked the SUBJECT VEHICLE, Ortiz exited the car and entered the CI's car, where she sold the CI a Glock 27 40 caliber pistol, two rounds of ammunition, and 109.5 grams of actual methamphetamine (as confirmed by Southwest Lab testing) in exchange for $1900; and

c. following that exchange, Ortiz re-entered the SUBJECT VEHICLE and drove with KHAN to the alley located behind the SUBJECT PREMISES, where the pair exited the car and walked inside the SUBJECT PREMISES.

**E.    Second Controlled Buy with KHAN and Ortiz**

17. Following that controlled transaction at the AutoZone, I instructed the CI to maintain contact with ORTIZ and the CI complied. In a series of telephone calls and text messages using coded language that took place between December 29, 2025, and January 6, 2026, ORTIZ agreed to sell the CI more guns and more drugs at the AutoZone on January 7, 2026.

18. In advance of the agreed-upon deal at the AutoZone on January 7, 2026, law enforcement outfitted UC-1's undercover car

with a recording device. Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

      a.   Ortiz and KHAN departed from the SUBJECT PREMISES, entered the SUBJECT VEHICLE, then drove together to the AutoZone;

      b.   after KHAN parked the SUBJECT VEHICLE, Ortiz exited the car and entered UC-1's car, where she sold the CI a Ruger 9mm caliber pistol, 11 rounds of ammunition, and 132.9 grams of actual methamphetamine (as confirmed by Southwest Lab testing) in exchange for $1900;

      c.   during that exchange, the CI asked Ortiz whether she could sell fully automatic firearms or machine gun conversion devices and Ortiz said "I will ask him right now and I'll let you know," (in an apparent reference to KHAN, who was still seated in the SUBJECT VEHICLE);

      d.   following that exchange, Ortiz re-entered the SUBJECT VEHICLE and approximately a minute later sent a series of text messages to the CI that read "he said to make a list[,]" "[o]f what you need," "[h]e said he can get anything u need just to send me a list" (again in an apparent reference to KHAN); and

      e.   Ortiz drove with KHAN to the area near the SUBJECT PREMISES, where the pair exited the car and walked inside the SUBJECT PREMISES.

**F.    Third Controlled Gun Buy With KHAN and Ortiz**

19.    Following that controlled transaction at the AutoZone, I instructed the CI to maintain contact with ORTIZ and the CI complied.  In a series of telephone calls and text messages using coded language that took place between January 7, 2026, and January 15, 2026, ORTIZ agreed to sell the CI more guns at the AutoZone on January 15, 2026.

20.    In advance of the agreed-upon deal at the AutoZone on January 15, 2026, law enforcement outfitted UC-1's undercover car with a recording device.  Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

a.    ORTIZ and KHAN arrived to the AutoZone parking lot together in the SUBJECT VEHICLE;

b.    after KHAN parked the SUBJECT VEHICLE, ORTIZ exited the car and entered the CI's car, where she sold the CI a Ruger .45 caliber pistol, a Smith & Wesson .40 caliber pistol, an A.A. Arms 9mm caliber pistol, and approximately 80 rounds of ammunition in exchange for $4800;

c.    during that exchange, UC-1 and the CI asked ORTIZ if "he could get ARs" (referring to KHAN) and ORTIZ stated "he" does, but that "he gets rid of them right away";

d.    following that exchange, UC-1 asked ORTIZ if s/he could meet KHAN, and ORTIZ said "no, he's real fishy."

9

## G.   Fourth Controlled Gun Buy With KHAN and Ortiz

21.   Following that deal, I instructed the CI to maintain contact with Ortiz and the CI complied. In a series of telephone calls and text messages using coded language that took place between January 23, 2026, and February 4, 2026, Ortiz agreed to sell the CI one long gun and six handguns at the AutoZone on January 4, 2026.

22.   In advance of the agreed-upon deal at the AutoZone on February 4, 2026, law enforcement outfitted UC-1's undercover car with a recording device. Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

a.   Ortiz and KHAN arrived to the AutoZone parking lot together in the SUBJECT VEHICLE;

b.   after KHAN parked the SUBJECT VEHICLE next to UC-1's car (approximately five feet from the passenger side of the car), Ortiz exited the SUBJECT VEHICLE and obtained a shotgun wrapped in a blanket from the rear of the car;

c.   after Ortiz handed the blanket-wrapped shotgun to UC-1, she returned to the SUBJECT VEHICLE, grabbed a backpack from the car, and re-entered UC-1's car;

d.   once inside UC-1's car, Ortiz pulled three boxes with four handguns inside out of the backpack;

e.   Ortiz exhibited confusion about the number of guns she brought to the deal (as noted above, she previously agreed to bring six total guns to the deal), so she exited UC-

10

1's car, reapproached the SUBJECT VEHICLE and opened the rear passenger door where she appeared to have a conversation with KHAN;

f.    following that conversation, Ortiz returned to UC-1's car and asked how many guns were present and when UC-1 replied, Ortiz returned to the SUBJECT VEHICLE and appeared to have another conversation with KHAN;

g.    after Ortiz completed her conversation with KHAN, Ortiz reentered the UC's car, confirmed the number of firearms and sold UC-1 and the CI a SCCY 9mm caliber pistol, a Stoeger 9mm caliber pistol, a Rock Island Armory 9mm caliber pistol, and a Remington 12-gauge shotgun in exchange for $6600; and

h.    after the deal was complete, KHAN and Ortiz drove back to the SUBJECT PREMISES and went inside.

### IV.    ATF identifies Unit B as Residence for KHAN:

23.    On or about June 03, 2026, I contacted a United States Postal Service Inspector who informed me that KHAN received parcels at Units B and C at SUBJECT PREMISES as recent as June 2, 2026.

24.    On June 4, 2026, law enforcement officers conducted surveillance at SUBJECT PREMISES and observed KHAN entering and exiting from the garage into the space between Units B and C. Law enforcement officers also observed KHAN place bags of grocery in front of Unit B.  At some point, KHAN entered Unit B, then exited, retrieved mail from the mailbox, and reentered Unit B.  A few minutes later KHAN exited Unit B with a plate of food and entered the garage.

11

25.   On June 11, 2026, law enforcement officers conducted another surveillance operation at SUBJECT PREMISES.  Law enforcement officers observed KHAN exit SUBJECT PREMISES through the rear gate and enter SUBJECT VEHICLE.  KHAN then parked the SUBJECT Vehicle on Yukon Ave.  KHAN then exited the SUBJECT VEHICLE and entered SUBJECT PREMISES from the rear gate, and entered Unit B.

## V.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

26.   From my training and experience, previous arrests, and the collective experiences related to me by other law enforcement personnel who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence or homes frequently used by them, or in places that are readily accessible, and under their physical control, such in their digital devices or vehicles. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices or readily accessible in their homes or vehicles.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These

12

photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.     Firearm traffickers often keep firearms in places where they have ready access and control, such as at their residences, in their cars, or in homes frequently used or accessed by them.  They also often keep other items related to their firearm trafficking activities at their residences, in their cars, or in homes frequently used or accessed by them, such as ammunition, firearm accessories, packaging materials, and proceeds of firearm trafficking.  These items are often small enough to be easily hidden and thus may be kept at a firearm trafficker's residence, cars, or homes frequently used by them even if the firearm trafficker lives with others who may be unaware of his criminal activity.

d.     Those who illegally possess firearms often also sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that they sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular

13

phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

e.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

f.    Firearms traffickers use their vehicles to transport weapons, store receipts, and meet with customers. Cars are also often used to conceal contraband because they have compartments (for example, under seats, within trunks, in the engine cavity) that provide quick access for the firearms trafficker but are less likely to be discovered accidentally by others in a home.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

27.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, among others, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until it is overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

14

replaced with more recently downloaded or viewed content and may also be recoverable months or years later;

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence;

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software; and

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for

15

devices or data that cannot currently be decrypted;

e.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises, person, or car for a number of reasons, including the following:

i.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required; and

ii.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

28.   The search warrants request authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally

16

displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress KHAN's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of KHAN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

17

## VII.  CONCLUSION

29.   For all the reasons described above, there is probable cause to believe that KHAN violated 18 U.S.C. § 922(a)(1) (Dealing in Firearms Without a License);

30.   Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT PREMISES, the SUBJECT VEHICLE, and on the person of KHAN as described in Attachment A.


                                   /s/
                                 Ani Ghaltakhchyan
                                 Special Agent


Subscribed to and sworn before
me this 23rd day of June, 2026.

THE HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE